UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:08-CR-118 |
| | ) | |
| ANTHONY BIANCHINI, *ET AL.* | ) | |

## **REPORT AND RECOMMENDATION**

Count One of the Indictment charges the defendant Bianchini, Robert Chapman, and Ryan Vaughan with conspiring to distribute, and possessing with the intent to distribute, Oxycodone pills. Additionally, the defendant Bianchini is charged in another count with possession of Oxycodone with the intent to distribute, and yet in another count with possession of Dihydrocodeinone with the intent to distribute. Some of the evidence that will be introduced against the defendant Bianchini is a quantity of Oxycodone and dihydrocodeinone pills seized from his vehicle on December 1, 2007, during a traffic stop on I-81 northbound at mile 44 in Greene County, Tennessee.

Defendant has filed a motion to suppress evidence of the pills seized from his vehicle, as well as any incriminating statements he subsequently made to Agent Mike Commons of the DEA Task Force. (Doc. 55). A hearing on this motion to suppress was held on April 16, 2010. The motion been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636.

It would not be hyperbole to say that the facts of this case, starting with the investigation of defendant and culminating with the traffic stop of his vehicle and his arrest,

is a classic example of excellent police work enhanced by a remarkable dose of good luck.

In September 2007, Detective Ginger Crowe of the Bristol (Tennessee) Police Department was conducting an investigation of drug trafficking in Bristol, specifically, trafficking of Oxycodone. On September 18, 2007, a search warrant was executed at the residence of Robert Chapman.[1] A wealth of incriminating evidence was found during that search, including Oxycodone pills, morphine, marijuana, cocaine, and miscellaneous other pills. Also seized were FedEx receipts regarding packages shipped to Mr. Chapman from the defendant Bianchini in Detroit. Also discovered and seized were banking records, including deposit receipts, that showed deposits of money by Mr. Chapman into a bank account owned by Bianchini. Also seized were Money-gram receipts that reflected payments to Bianchini from Chapman. Suffice it to say, a great deal of evidence was seized that suggested that Mr. Bianchini and Mr. Chapman were intensively involved in drug trafficking, especially Oxycodone.

One month later, Ryan Vaughan was arrested.[2] The arresting officers found the same type of money receipts on Mr. Vaughan that indicated that he also deposited money into the same account that Chapman made deposits for Bianchini's benefit.

Vaughan agreed to cooperate with Detective Crowe and her colleagues in their investigation. As part of Vaughan's cooperation, in early November 2007, he agreed to

---

[1] Mr. Chapman, of course, is a defendant in this case, but he has already entered into a plea agreement.

[2] Vaughan also was a co-defendant in this case, and he too has entered into a plea agreement.

make a "controlled buy" of pills from Bianchini. While Vaughan and Detective Crowe were in the process of attempting to contact Bianchini, Bianchini placed a phone call to Vaughan, during which he said that he had already shipped a package to the UPS Store at Exit 7 on I-81. Detective Crowe and Vaughan promptly went to that UPS Store and retrieved the package; in it were 29 Oxycodone pills. Not only was Bianchini's name on the packing slip of this package, his fingerprints were found on the pills and the packaging material.

Over the next few weeks, Vaughan continued to deposit money into Bianchini's bank account in payment for those pills.

Detective Crowe contacted both the DEA in Johnson City (Agent Mike Commons) and the DEA in Detroit. The DEA in Detroit opened up its own separate investigation of the defendant Bianchini in the Detroit area, including surveillance.

On November 30, 2007, Vaughan and Detective Crowe made a deposit into Bianchini's account, after which Vaughan, in Detective Crowe's presence, made a phone call to Bianchini to confirm the deposit. During that call, Bianchini told Vaughan that he was going to transport pills to Tennessee.[3]

Detective Crowe contacted the Detroit DEA and told the agents there of Bianchini's apparent intent to make a delivery of Oxycodone pills to the Bristol, Tennessee area. She also e-mailed a copy of the transcript of the recorded phone call between Vaughan and Bianchini. Either during the very late hours of November 30 or the early morning hours of

---

[3] That call was recorded. The disc of the recording and the transcript were filed as Exhibits 1 and 1-A.

December 1, 2007, DEA agents in Detroit placed a tracking device on defendant's car, a white Jeep Cherokee. The Detroit agents described Bianchini's car to Detective Crowe, as well as giving her the Michigan license tag number on that vehicle.

Some time later on December 1, 2007, the Detroit DEA called Detective Crowe to tell her that Bianchini had started his trip to Tennessee. Detective Crowe immediately called Agent Mike Commons to tell him that Bianchini was on his way to Tennessee. In turn, Commons enlisted the assistance of the Tennessee Highway Patrol; he called Trooper Kevin Kimbrough about the situation. He described the vehicle to Kimbrough, including the Michigan license tag number on it; he also told Kimbrough that there was a tracking device on the vehicle. Agent Commons wanted the Tennessee Highway Patrol to make a pretextual traffic stop, if they could develop probable cause to do so. Agent Commons, of course, had ample evidence that Bianchini was deeply involved in the trafficking of Oxycodone, and he had more than a reasonable suspicion to believe that Bianchini's trip to Tennessee was for the purpose of delivering Oxycodone pills. Nevertheless, he did not know for a certainty that Bianchini's vehicle contained drugs. He hoped that a pretextual traffic stop would lead to a search of the vehicle and the discovery of any drugs therein.[4]

As Bianchini traveled southward, the Detroit DEA monitored the tracking device, periodically providing Detective Crowe and Agent Commons with updates regarding Bianchini's location.

---

[4] All of this occurred, of course, in 2007, long before the Supreme Court's 2009 decision in *Arizona v. Gant*, 129 S.Ct. 1710.

Trooper Kimbrough and a number of other Tennessee State Highway troopers were intently listening for information regarding the whereabouts of Mr. Bianchini so they could attempt to effect a traffic stop of his vehicle as they had been instructed to do. There had not been any recent updates regarding Bianchini's location because the tracking device on his car did not function particularly well as Bianchini crossed first the Cumberland Mountains and then the Clinch Mountain range. Because he had heard nothing, Kimbrough occupied himself with a traffic stop involving a sizable quantity of marijuana in Cocke County, Tennessee. Having finished with that task, Kimbrough drove on Interstate 40 to its intersection with I-81, and then turned north on I-81. At that point, the tracking device on Bianchini's car revealed that he was not only already on I-81, but a short distance ahead of Kimbrough.[5] And it is at this point that the agents' good luck played such an important role.

State Trooper Lee Cutshall was patrolling the roads of Greene County, Tennessee, during the evening of December 1, 2007. Cutshall knew absolutely nothing about the investigation regarding Mr. Bianchini, or the DEA's desire to stop Bianchini for a traffic violation. As Cutshall was driving north-bound on Interstate 81 shortly before 7:00 p.m., at which time it was completely dark, Cutshall came upon a vehicle which had its tail lights

---

[5]The route Bianchini took to Bristol, Tennessee, at first blush, seems to have been a circuitous one. In fact, however, it was the only reasonable route one could take from Detroit, Michigan to Bristol, Tennessee. He first took Interstate 75 South to its intersection with US 25E in Corbin, Kentucky. He then took US 25E South to its intersection with I-81 at mile 8 in Hamblen County. He then drove north on I-81, which goes through Bristol. The only "direct" route from Corbin, Kentucky to Bristol, Tennessee is a relatively narrow and winding road in the Cumberland Mountain area of Virginia. It is an incredibly scenic drive, but it would have taken far longer, and would have been more hazardous, than the route he actually took.

obscured to some extent. When he first saw the vehicle, he thought it had no tail lights at all, but when he got within 75-80 feet of it, he saw that the vehicle was equipped with what he perceived to be dark, purple tail lights.

Tenn. Code Ann. § 55-9-402(b) requires that every motor vehicle must be equipped with two *red* tail lights and two *red* stoplights, and the brake light, when actuated, must be capable of being seen 100 feet away in normal daylight. Concluding that the tail lights on the vehicle in front of him were in violation of this statute, Trooper Cutshall turned on his blue lights to commence a traffic stop.

Exhibit 3 is a video recording of the traffic stop. Defendant begins pulling over to the side of the roadway at 7:00 p.m. Cutshall already had called his dispatcher to report what he was doing, and included within that radio transmission was a description of the car and the Michigan tag number on it. Trooper Kimbrough, who was a few miles back to the south on Interstate 81, heard that transmission and knew immediately that Cutshall had stumbled onto Bianchini's car. Kimbrough used his cell phone to call Cutshall, explaining to Cutshall that they had been looking for this car and the reason for their interest. Trooper Cox, who also was aware of the Bianchini investigation, pulled up behind Trooper Cutshall's vehicle almost immediately. Kimbrough, accompanied by his K-9 dog, arrived within just a minute or two.

Trooper Cutshall walked up to Bianchini's car to tell the driver why he had been stopped, i.e., the obscured tail lights. In the car was the driver, Bianchini, and a passenger,

Gross. Cutshall promptly was assailed by a particularly strong odor of burnt marijuana.[6]

The tail lights on Bianchini's car were fitted with dark covers that were kept in place by velcro. When none of the lights in the tail light assembly were activated, the light assembly appeared to be totally black. When the lights were on, either by activating the tail lights by turning on the head lights, or by depressing the brake pedal to activate the brake lights, the emitted light to Cutshall appeared "purplish." To Rick Taylor, who testified on behalf of the defendant, the light appeared "red." This is an issue that will be discussed later in this report.

Trooper Cutshall instructed Bianchini to remove the covers from the tail lights, an action which is captured on the video recording of the traffic stop. The difference in the hue of the light, and especially the intensity of that light when the covers were removed, is striking. It cannot be reasonably argued that these after-market tail light covers did not significantly diminish the intensity of the vehicle's rear lights, nor can it be argued that it did not change the hue of the light.

At 7:05 p.m., Cutshall asked Bianchini for permission to search his vehicle, and Bianchini consented; not only did he verbally consent, he executed a written consent.[7] More or less simultaneously with Bianchini's written consent to search his vehicle, Trooper Kimbrough's drug dog alerated on both sides of Bianchini's car. And, of course, it must be

---

[6]The odor was as strong as it was because either Mr. Bianchini or Mr. Gross, or both, were smoking a "blunt," which is essentially a marijuana cigar.

[7]Exhibit 2.

recalled that Cutshall detected the strong odor of burnt marijuana when he first made contact with Bianchini.

There were two bases upon which Cutshall and Kimbrough could have lawfully searched Bianchini's vehicle. First, based upon the odor of burnt marijuana and the positive alert of the drug dog, they had probable cause to perform a warrantless search.[8] Second, they had Bianchini's written consent to search.

A pat-down search of defendant revealed a single Oxycodone pill in one of defendant's pants' pockets.

As Cutshall searched the interior of the car, he noticed that the plastic or vinyl moulding around the car's sunroof was "nasty," and it bore scratch marks indicating that tools, e.g., a screwdriver, had been applied to it with some frequency. Cutshall reached up and put his fingers under the moulding and it immediately came free from the headliner; it was attached to the headliner by only one poorly-fastened screw. When the moulding came free, the officers discovered 300 pills in 3 cylindrical rolls of plastic wrapping. As they continued their search, the officers found the remnants of the marijuana blunt beneath the cover of the gear shift lever.

Cutshall warned Bianchini and Gross of their *Miranda*-rights, and then transported them to the Greene County Jail.

---

[8] The "automobile exception" to the Fourth Amendment's requirement for a warrant allows officers to search a vehicle so long as it is mobile and they have probable cause to believe that it contains incriminating evidence of a crime. *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *United States v. Mans*, 999 F.2d 966, 969 (6th Cir.) *cert.* denied, 510 U.S. 999 (1993).

Agent Commons in the meantime had learned of the traffic stop and Bianchini's arrest, as had Detective Crowe. Commons and Crowe went to the Greene County Jail and interviewed Bianchini after again giving him his *Miranda* warnings. Commons asked Bianchini if he had "any problem" talking to him, and Bianchini responded that he did not. Oddly, Commons was not sure of the various charges filed against Bianchini, so Commons asked Bianchini what he was charged with. Bianchini then uttered something about the "300," presumably referring to the 300 Oxycodone pills found in his car. At that point Bianchini said he wanted to talk to "someone," although he explicitly said that he did not want to talk to a lawyer. Notwithstanding that Bianchini suggested that he wanted to talk to someone other than a lawyer, Agent Commons prudently terminated the interview.

**ANALYSIS**

Defendant has only one theory to support his motion to suppress; he argues that there was no probable cause to stop his vehicle for a violation of Tennessee's tail light law. In this regard, defendant asked Mr. Rick Taylor, who is an investigator with the Public Defender's Office for the Third Judicial District, to make various photographs of defendant's vehicle with the tail light covers on it. As those photos were introduced, Mr. Taylor testified that he could see the actuation of the brake lights 100 feet away in daylight, as the Tennessee statute requires, and that the light was "red.".

As already noted earlier in this report, the video recording of the traffic stop clearly shows a marked difference in both color and intensity of the tail lights when the covers were removed. The issue is not whether Mr. Bianchini would have been found guilty by a state

judge of violating this statute, but whether there was probable cause for an officer to believe that he was in violation of the statute. There was more than probable cause; had this magistrate judge tried Mr. Bianchini on a charge of violating the state statute, Mr. Bianchini would have been found guilty beyond any reasonable doubt. The tail light assembly on Mr. Bianchini's vehicle, as he had modified it, was a violation of the statute and a danger to following traffic, especially during nighttime hours. Moreover, the statute unequivocally requires that vehicles in Tennessee be equipped with two *red* tail lamps and *red* stop lights. Putting aside for the moment the difference in intensity and color when the lights were on, it is unquestionable that the tail light assembly was totally black when the lights were not actuated; that alone is a violation of the statute.

In any event, the issue is whether there was probable cause to believe that there was a violation of the tail light statute, and this court has no hesitation in finding that there was. And perhaps this is a good time to reiterate that this was not a "pretextual traffic stop" in the sense of *United States v. Ferguson*, 8 F.3d 385, 391-92 (6th Cir. 1993). To put it colloquially, Trooper Cutshall was blissfully clueless about Mr. Bianchini and the DEA's investigation of him. Cutshall saw what he believed to be a violation of Tennessee's tail light law, and he made a traffic stop on that basis, and only on that basis.

In conclusion, Trooper Cutshall had probable cause to believe that defendant was in violation of Tenn. Code Ann. § 55-9-402(b), and he therefore effected a valid traffic stop. Within five minutes of the commencement of that traffic stop, Mr. Bianchini had given his verbal and written consent for the Troopers to search his vehicle. Quite apart from that

consent, the officers had probable cause to believe that the vehicle contained marijuana, at the very least, based upon the odor of burnt marijuana, as well as the drug dog's positive alert. The discovery and seizure of the drugs from Mr. Bianchini's vehicle was lawful under the Fourth Amendment.

Bianchini was appropriately advised of his *Miranda* rights and his statement regarding the pills seized from his car were made with knowledge of his constitutional right to remain silent.

It is respectfully recommended that Mr. Bianchini's motion to suppress, Document 55, be denied.[9]

Respectfully submitted,

    s/ Dennis H. Inman
United States Magistrate Judge

---

[9]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).